So the first two cases we have for argument, and we're hearing them argued separately, although there's obviously an overlap. First case is 17-1224, Land of Lincoln Mutual Health v. United States. Mr. Massey. Thank you, good morning, and may it please the Court. Jonathan Massey for Appellant Land of Lincoln, and with the Court's permission I'd like to reserve five minutes for rebuttal. I'd like to address two points. First, Section 1342 is money mandating, and second, the government's obligation was not vitiated by the appropriation riders beginning in December 2014. Well, you agree that there's a possibility, a legal possibility, that that obligation, to the extent it exists, could be obviated by subsequent appropriations. So you're just saying that the clarity or the lack thereof in the language of these riders does not do that. That's correct, Your Honor. We have four points on that. First, as Your Honor correctly stated in the legal test, it has to be a clear statement under cases like New York Airways, the Supreme Court's decision in TVA v. Hill in 1978, which says we presume Congress does not do substantive things in the appropriations laws. So we know one thing. At one extreme, we know silence is not sufficient. Just a failure to appropriate money by itself is not sufficient. That's correct. But beyond that, the cases are kind of diced, right? Well, they're diced, but I think they're actually clear. I mean, if you look at cases like Dickerson and Will, those cases have quite elaborate language explaining what it takes to vitiate a money mandating obligation. Well, Will seems to me, tell me why I'm wrong or if I'm wrong, the difference in Will is that Will has this language and other statutes, right? Well, it has four consecutive years of appropriation riders, which were all construed together. And so one of them said no part of the funds appropriated in this act or any other act shall be used. But then the next provision, the next year, said the salary increase that would be made after the date of enactment shall not take effect. Another one said no part of the funds appropriated by this act or any other act may be used. Yes, so that's one point. One of the salient differences between that and this case is that it says in any other act. Why would that matter? I mean, I don't recall that the court in Will referenced that language in any other act and specifically called that out as being significant. I think it looked at all four together. And the fourth one, just to complete, is funds available for payment shall not be used. So there were four riders coming that were being construed together. I don't think the court said that using this act or any other act by itself would have been sufficient. It was looking at all four together. Of course, the appropriation riders here do not say or any other act. And what do we mean by that? So what's the other act in this case? Are we talking about the judgment fund? Well, that might be one source, but I don't think we know exhaustively what funds were available. In other words, we know at least four sources of funds were available, even under the appropriation riders, just to list them. First would be payments in, $484 million. The government concedes payments in would have been available to pay, even though there's no specific appropriation for that. I think there's an inconsistency in the government's position, frankly, where they admit, they acknowledge payments in are available. There's not a specific appropriation. But you don't have to allocate money for that. If it's payments in, the government is just being a conduit. Of course, the government here is more than a conduit. It was sharing in the risk. I'll get to that point in a moment. So payments in are available. The fiscal year 2014 money was available, even under the appropriation riders, because under our view, it's reply brief 2425. And the GAO looked at that and said that money, using the 2014 appropriations language, that money would have been available. The GAO may or may not have been exhaustive, because after the GAO report issued, we know that Judge Wheeler looked in footnote 13 in the MOTA opinion and found $750 million in continuing appropriations under the fiscal 2015 language. And then there's also some money from user fees and sales of data. That's appendix 9, footnote 10. So all of that money was available, even under the appropriation riders. So the appropriation riders did not cut off even all funds. Even if they had cut off all funds, all the riders did was basically Gibney language. That was the language in Gibney. Gibney eliminated the only source of payments for the INS overtime employees. And the court still said, this court's predecessor still said, that judgment could be entered against the United States in this court or in this court's predecessor, notwithstanding the elimination of the only available money. And of course, there are other cases where there was no appropriation at all. In the Collins case, going back to 1879, there was also the Strong and Danforth cases. No, but we understand. Right, exactly. You were all on the same page. No, silence means we win. And here we think, there's not even silence. There's actually affirmative appropriation going on. So clearly, the appropriation riders. What about the argument? And I think Judge Wheeler relied on this, which is the judgment bond. That's another appropriations, and that's available. So the cutoff would have to be for that. I think he relied on that in his opinion right there. That strikes me as a little unusual. I mean, I don't know of any instance where appropriators have talked about the judgment bond. Do you? Well, I don't think you need to. Well, let me just say two things. Yes, there are cases, I think Rama and Navajo being the primary one. In page 198 and footnote 9, the court says the judgment fund is available to pay this judgment. That's why it does not run afoul of the appropriations clause. Yeah, but the judgment fund, I mean, most of the Supreme Court cases we're looking at are in the 1890s or shortly thereafter. The judgment fund didn't even come into effect until the 1950s, right? That's correct, 1956. I think actually Judge Newman's opinion in Slattery is the most exhaustive, best explanation of the history of the judgment fund. And the history is that Congress increasingly relaxed the constraints on the judgment fund. In 1956, made it a standing indefinite appropriation. In 1977, it eliminated the $100,000 cap on the judgment fund. So Congress has basically recognized that this court is the entity that is most, that's in charge of the judgment fund. And we don't need now specific congressional appropriations. So we think the history of the judgment fund, frankly, cuts in our favor because it shows that Congress has delegated to this court the obligation of entering judgment against the United States. And so if no payment were to be made, it would be necessary for the appropriators to specifically cut off any payments being made from the judgment fund as well as through the appropriations there? Well, that would be, if they, that could be, yes. But we think actually beyond that. There needs to be a substantive modification of 1342. Just, I think if this court entered judgment in Congress and did something to the judgment fund, there would be an interesting takings question about that. And I don't think you have to decide that today in order to enter judgment. But I do think that Ramo Navajo, and frankly, the government's position in the Burwell case, which is cited at footnote, at page 8 of our reply brief. The government, until this case, the government was taking the position that the judgment fund was an available source of payment for these kinds of obligations. So we're not, there's plenty of authority to look to the judgment fund. I don't think the court has to decide that question today. But let me all just talk about the clear statement test and why nobody at the time of the appropriation riders understood those riders as having the effect that the government says they had. And I don't think you can meet a clear statement test when none of the relevant actors at the time understood it that way. I mean, President Obama signed the appropriation riders with no signing statement, even though he had standing veto promises. Well, it's a little problematic if we start looking at not even legislative history, but just what was going on. Because in the other case, at least Mota concedes that when Congress enacted this statutory requirement, we'll say, for your purposes in the first instance, they didn't contemplate, given the situation, that there was going to be any additional appropriations necessary. But it's only when the transitional policy came in a year later that that kind of created the havoc that resulted in this. So I don't know if you want to go there, if it's helpful to start with. Okay, well, I won't go there. But let me just put a light touch on it, because I do think that when you have a clear statement rule, it's relevant evidence. Did anyone notice? And the President didn't notice. HHS didn't notice. HHS kept issuing statements until September of 2016, recognizing that these were obligations of the United States. Actually, it's interesting, because Chevron, the government, has run away from Chevron the whole case. And that's because HHS always saw the statute as a money-mandating one. Can I cut you off, though, because your time is running up, and I want you to reach at least something on the contract claim. On the contract claim, certainly. Okay, and I'd like to, right, before I leave, though, can I just say the appropriation riders come in in December of 2014. Land of Lincoln was obligated already to provide insurance on the exchange through 2016. Its contract with the government, and this dovetails with the contract argument, the loan agreement that it entered into in December 2012, obligated it to stay on the exchange and provide insurance through 2016. And so the appropriation riders have this retroactive effect, especially for Land of Lincoln, because everyone had already signed up, had already provided insurance in 2014. The benefit year was almost over. Everyone had already agreed to provide insurance contractually through 2015, because you sign your QHP agreements in the fall. So by the time the riders came in in December of 2014, everyone was already on the hook for 2015. Lincoln was also on the hook for 2016. And so to apply the appropriation riders, as the government does, has this very unfair retroactive effect. And obviously there's a- Does that only affect whether it's a taking or not? Well, I think there's a presumption against a retroactive legislation, and I think there's an implied contract claim when the government pulls the rug out from underneath you and changes after you've already performed. So I think the retroactive impact is relevant to all of our claims. Before you go to the contract theory, the government argues that 1342 isn't even an appropriation. It's only an authorizing statute. And they point, and I've looked at every one of them, at page 19 in the road brief and the footnote, for not only the Medicare portion of the ACA statute, but more than several dozen other statutory sections. And we pulled every one of them. And in every one of them, they have not just authorizing language, but clear appropriation language, unequivocal appropriation language. This is the same statute as yours. Under the canons of statutory interpretation, your section doesn't have similar appropriation language. Wouldn't that weigh against the idea that 1342 included both authorization and appropriation? Well, let me address that in two ways. One, there doesn't need to be an appropriation for a money-mandating statute. The government concedes that at page 27. It was what we were talking about. I was talking about the Chief Judge's prose. There's silence. Correct. Here's the problem for you. This statute chose to do it in dozens and dozens of places. So is it simply superfluous in all of those places? Well, no. Let's look at those footnotes, the footnote four, because I pulled those, too. There's two categories. First, there's language that says there's authorized to be appropriated. And that's actually the vast majority of cases that the government cites. That language actually means nothing. When Congress says it's authorized to be appropriated, it would still have to go back and actually appropriate. But there are four cases where there's actual money given to programs. So when it says authorized to be appropriated, there would have to be an appropriation or there's no authorization. But here, since it only says authorized and not authorized to be appropriated, there's both an authorization and an appropriation? No, no. I'm not claiming there's an appropriation for us. I'm just saying that in many of the cases the government cites where it says authorized to be appropriated, that's actually not a big deal. Because Congress would still have to appropriate. That's a placeholder, essentially, that doesn't guarantee appropriations anyway. There are four instances in footnote four where there's actually money provided in the statute. In all of those cases, there are programs that need to begin right away, like financial assistance to states, technical and financial assistance, to create the exchanges in the first place. So the ACA is enacted in 2010, and Congress knows that it needs to get some programs off the ground immediately. So those are the funds it funds. In footnote four, the government cites, those are the programs that actually have funding now. The Risk Corridor Program, the government says, and we agree, it wasn't going to start for several years. So the government did not need to, Congress did not need to appropriate in the ACA directly money for the Risk Corridor Program yet. It did not need to program it. That's a lot of asking me to surmise the basis behind why statutory language differs based on absolutely no textual evidence. Well, I think the textual evidence here is the language of 1342B, which creates a shall pay obligation, and it says in mathematically determined amounts what the government shall pay. It will pay based on the ratio of allowable plan costs to the target. It will pay, it will share in the risk, and it will pay if it's above three percent. Section 1563A also adopt expressly, Congress adopted and made statutory the CBO report results, which said payments in would equal payments out, and this would be budget neutral. Well, Your Honor, with respect, the CBO scored the bill as a whole. It did not look at risk corridors. So 1563A said the law as a whole would have this budgetary effect and not the Risk Corridor Program in particular. 1563A is not about the Risk Corridor Program in particular. The only time CBO scored Risk Corridor was in February of 2014. It concluded it was not budget neutral. That's Appendix 54 in the appendix. So I think the CBO is strongly on our side, frankly. The CBO, the only time it looked at Risk Corridors, said it was not budget neutral. But with respect, I do think that the text of 1342B and the way it's different from the Reinsurance Program and the Risk Adjustment Program, 1341 and 1343, the Reinsurance Program is clearly budget neutral because 1341B1B says that it will be monies so used. In other words, the Reinsurance Program is payments in, payments out. Even though the CBO report included budget numbers for any programs, including the other 3R programs, which it thought would have deficits? It didn't score Risk Corridors until February 2014. It just didn't. And Appendix 390 says that. And it may have assumed it. It may have assumed budget, may have made certain assumptions. But it didn't score it until February 2014. You're almost out of time, so you should probably turn to the contract question because I think our Chief Judge had an address. Yes, okay. So the contract question, I think, as I said, is bolstered by the fact that we were on the exchange until 2016. And the contract is an applied-in-fact contract. It's a promissory contract. What does it derive from? The statutory language on the appropriations or on regulations? I would say a combination. Statute, regulations, statements of the parties, the QHP agreements that we entered into that made an Appendix 66 Risk Corridors mentioned in the QHP agreements. It was part of the contemplation of the parties. And the implied contract is just like the Radium Mines case or the New York Airways case where when there's a promissory scheme that offers a party the opportunity to perform and the promises the government will pay, that creates an applied-in-fact contract. So we think Judge Wheeler was right in the way he analyzed it in Mota and Molina. And we think the Radium Mines and New York Airways are the primary cases that we rely on. Okay, thank you. We'll restore three minutes of your time. Thank you, Your Honor. Thank you. May it please the Court. Elisa Klein for the United States. Going back to where the conversation began, the controlling issue is Congress's intent in enacting the appropriations legislation that it enacted first in December 2014 and repeatedly reenacted years after that. There is no serious dispute that Congress has the power through appropriations legislation or otherwise to cap the payments under the Risk Accord. So let's just get down to some of the details. What about your friend's argument that the Arriver language was quite explicit and there were other sources of funding beyond that, leaving aside the Judgment Fund, which is kind of a separate deal? Exactly, yes, Your Honor. Judge Brugink in the main community health options addresses all of these arguments and he's exactly right. The way this Court and the Supreme Court look at funding legislation, appropriations legislation, to determine Congress's intent is they look at the provision in context, what had been going on along with the legislative history. Here, as the Court knows, Congress, in anticipation of the appropriations process, asked the GAO, identify the universe of funds that are potentially available to make Risk Corridor's payments when the time to make those payments comes due, which would not be until calendar year 2015. GAO says, I have identified two potential pots of money. One are the payments in that the insurers would start making in calendar year 2015. That's what's referred to as user fees, but it's a specific kind of user fees. And the other, the GAO says, potentially a lump sum for CMS program management, but only, Congress, if you reenact the same language of the Annual Appropriations Act for future fiscal years, because otherwise those acts are annual only. And Congress, thank you, GAO, says, I am reenacting the user fee language, which is the appropriation that allowed HHS to take money in and distribute it, to make payments out. You needed that appropriation. But Congress, in the same appropriations legislation, said, none of the other funds that GAO identified may be used for Risk Corridor's payments. Why was it not necessary for the Congress to also explicitly rule out the judgment fund? Because the judgment fund exists only to pay final judgments. It has nothing to do with whether a judgment should be entered in the first place. That's a question of statutory interpretation. Congress's intent when it legislates with respect to the particular program, and that includes the appropriations legislation. Can I ask you a technical question? Yes. And this is that we have lots of terms. I think I understand appropriations and authorization and all of that. But there's the other term that I think comes out of the Medicare stuff, which is budget authority. And I think there are some arguments made about budget authority. Can you explain to me what that is and what's necessary? Yes. So budget authority is a defined term in that statute. It's 2 U.S.C. 622. This is the way Congress has implemented its appropriations clause power through a whole series of statutes, and one of which lays out different types of budget authority that it can give to an agency. And then the other statutes, including the Anti-Deficiency Act, make clear that an agency may not spend a penny unless and until Congress either appropriates it or what it did in the Medicare Part D statute was explicitly it gave HHS authority to spend money in advance. Is the government's position that that has some effect on this case? It doesn't matter. Our position as Judge Bruggen is 100% correct in that even if you assume for the sake of argument that 1342 of the ACA said insurers are entitled to 100% payment, it doesn't matter because that's just a statute. It's a statutory right. It's not a contract, and I will address the contract claim. Statutes, as the Supreme Court emphasized in the Amtrak decision, that National Railroad Passenger Corporation decision, statutes do not bind later Congresses, which is later Congress is entirely free to amend the terms of a prior statute and including through appropriations legislation that... that it would not, there would be no compensation and that all of the participants are charged with understanding that? Yes, Your Honor. Congress's intent was clear when it enacted the appropriations legislation in 20... Something was said. This is not a mere omission case in the way that term has been used. Congress did not merely fail to appropriate a sufficient amount. Congress affirmatively appropriated the amounts that were paid in and explicitly barred HHS from spending the only other funds that were potentially available. But that was done subsequently, so your position also has to be that retroactivity of a change in the relationship needs to be applied because of the legislation. We do not agree that there is any issue of retroactivity here, but yes, even if there were, that is the holding of the Supreme Court's Amtrak decision and the other cases that say a statute does not bind a later Congress. Congress can legislate retroactively, and the only question would be, did Congress intend to cut off or cap payments? And here... Just to be clear, the reason the government argues there would be no retroactivity, if I understand it, is the riders are September fiscal year, and the total amount, whether the insurance companies came up short or had an overage, was not decided until December. Is that right? They were counted per year? It was. So I think... Lincoln on page 31 of its own opening brief makes the point correctly, which is that the first appropriations legislation was December 2014, and no obligation could possibly accrue until calendar year 2015, as they emphasized, five years after the ACA was enacted in 2010. And then just to turn back to the colloquy Your Honor was having, Congress did not appropriate any funds in the Affordable Care Act for the Risk Corridors Program. It authorized the program, but... Is it your view that every statutory section that authorizes and details payments has to include magic language about appropriations? No, Your Honor. Or is it something unique about this statute? Really, neither. It's that for there to be an appropriation, there has to be certain specific language. It's established that a shall pay directive without identifying a source of funds is not an appropriation. That's just black letter appropriations law. We quote the GAO Red Book for that proposition. I don't believe the other side is claiming that there was any appropriation in Section 1342. That was not Judge Wheeler's conclusion. I don't think they're claiming there was an appropriation, but there was an obligation, nonetheless. Right. And in that respect, Judge Leto was correct in this case. Congress did not. You say Judge Leto was correct. You seem to have abandoned his entire rationale. So I guess you mean he was correct on judgment? No, we're saying it doesn't matter if Judge Leto was correct when he said that Section 1342 did not make these payments an obligation of the government, because Judge Bruggink was correct when he said, even assuming, arguendo, that 1342 had made risk orators payments an entitlement, a 100% payment, even assuming that, Congress has the power later to change its mind, to modify the earlier legislation to cap payments, and the only question is one of congressional intent and there are no magic words required. You can see that from the Supreme Court's decisions in Dickerson and Will. You really have abandoned the Leto analysis here on appeal, so do you now agree that if you don't prevail on the appropriation writers taking back whatever Obligation 1342 created in excess of the payments in, that the government does not win? No, Your Honor. And there were two sections to our brief. I believe it was A and B. One was Judge Leto's correct reasoning, which is that in the first instance, 1342 did not make the taxpayer the guarantor of insurance industry losses. All it did was... He based his reasoning entirely on deference. We do not agree with the deference rationale, but as a matter of law, Congress has the power of appropriations, and just looking at the statute, it was generally modeled on Medicare Part D, but unlike Medicare Part D, there's no appropriation, there's no budget authority in advance of appropriations, and there's no language that says the payments are an obligation of the government, and therefore it's no surprise that CBO did not score risk corridors when it was giving Congress advice before Congress passed the Affordable Care Act. Do you want to get back to Judge Newman's question? Okay, go ahead. I wanted her to get back to your point. All right. What is the government's explanation for this massive reliance on what you now tell us is meaningless? That all of these entities that suffered very large, substantial, and were not forced into bankruptcy losses in operating under this system, you're saying that they misinterpreted the legislation, should not have relied on what seemed to be apparent in the legislation, that they misread it? How do you explain what happened, the consequences that we now have? Well, as the Supreme Court and this Court have repeatedly held, even if there were reasonable reliance on agency statements, that does not in any way impair Congress's appropriations power. So in schism, this en banc court said, yes, military recruiters made promises to recruits saying you'll get free lifetime medical care. Let's stick with this case and tell us why all of these major advisors, lawyers, and all else were wrong in apparently appearing to rely on the statute. Again, we don't even understand the reliance. Even after HHS said repeatedly, March 2014, April 2014, May 2014, we will implement this program in a budget-neutral manner, the insurers continued to sell plans. They decided how to price their plans, how to design their plans. They sold for 2015. They sold for 2016. But they had said contrary stuff the year before. I mean, starting in March 2015. And they had said still contrary, still contrary stuff the year before that. So there's no question HHS said inconsistent things. However, as a matter of law, if HHS says we will remit payments regardless of receipts, that is necessarily subject to Congress's appropriations. It would be a crime for HHS to pay out money that Congress hadn't appropriated, and it would not be reasonable to infer from that statement that HHS was going to act in derogation of Congress's appropriations power. But even, this is why I was talking about the other cases. I really, I do want an answer to this. You say that it was not reasonable to rely on the legislation? We say two things. Even if there had been reasonable reliance on statements by an executive branch agency, that would be legally irrelevant under OPM versus Richmond, and Schism, and FCIC versus Merrill. Because as the Supreme Court and this court have emphasized, the appropriations power belongs to Congress. But the gentleman's question, as I understand it, is not statements made. It's that the statute, let's assume we read the statute as saying, and creating at least an authorization obligation. I think that's Judge Newman's point. Thank you, Your Honor. There we have the Supreme Court precedent that says statutes do not bind Congress. And particularly here, you have shall pay language that's relevant for jurisdiction. We don't dispute this court's jurisdiction, but it in no way committed Congress to a particular funding level. It did not appropriate funds at all. So nothing could happen under this program until Congress enacted appropriations legislation. Until Congress appropriated funds in December 2014, insurers had at most a hope that Congress would appropriate certain funds. And they may well have had a hope that the payments in would cover payments out. Imagine we don't view it that way. Imagine we view 1342 as authorizing and obligating the government to make these payments, not create some hope that they'll make the payments, but actually do so. But then imagine we view the appropriation as taking that hope away, except it's not really hope, it's an actual obligation. Now why don't you move into their contract and takings claims and tell me why they don't at least have some sort of cause of action for the period that they were lured into committing to this program and operating under it at a loss, with the belief the government was going to share in any losses that they had, and then the government came along later and said, I've changed my mind, I'm not going to share in it. So imagine that that's our view of the statute. 1342, authorized and obligated appropriation, cut it away, but these people were stuck already in the program and then suffered losses in reliance on the original statutory language. Why isn't there either a contract or a takings clause of action? Because under the Supreme Court's Amtrak decision, this court's Brooks decision, before you can infer an intent that the legislature bound itself in contract, as opposed to just saying this is an obligation, which I'm assuming for argument's sake, Congress had said, you need a clear indication that the legislature intended to bind itself, legally bind itself in contract. And the Supreme Court in the Amtrak decision gives an example from an earlier case where the statute said, the states hereby covenant and agree, and the Supreme Court says, that's the language of contract. And they look at the Amtrak statute and said, it doesn't matter if you, Railroad, entered into arrangements with Amtrak thinking that this statute entitled your employees to ride for free, which is the issue in the Amtrak case. Congress is presumed to enact statutes, not contracts, and there is nothing in 1342 that uses any language of contract and nothing in the circumstances. The other side relies on radium. Radium, the provision explicitly said, if you offer uranium, we will forward a contract. I mean, uranium, that used the language of contract. New York also, which is their other case, and these both predate the Supreme Court's Amtrak decision, but New York, the claims court emphasized that Congress itself referred to liquidation of contract authorization and repeatedly recognized in the congressional debates that these were contractual obligations. There's nothing like that here. If they weren't at least contractual obligations of some sort, even implied versus expressed, tell me now about why they're not takings, why there hasn't been a taking. There can't be a taking unless there is a contract. That's the part I don't know that I agree with, so why is that? You can't rely on atoms. It's dicta, and it's general and broad in atoms. What other cases do you have? This is the point of the Supreme Court's Amtrak decision. The point is, Congress, the legislature, is assumed to enact policies that Congress can change. It's at absolute liberty to change. That's why we don't lightly infer that statutes are contracts, because Congress doesn't have the same freedom to override the government's contracts. That would raise takings questions. This is the dichotomy. The whole point is, Section 1342, it just said, the secretary shall establish and administer a program of risk corridors in which qualified health plans shall participate in a risk adjustment system. It also said it shall pay. The payment methodology set out shall pay, yes, but there's no contract. Again, this is just like in Brooks, where the statute says if you bring a successful key tam action for false patent marketing, then you get half of the damages, and Congress later took that right away, and this court said, there's no contract. That's not the language of contract, and no one gets to rely on the continued existence of a statute, and a statute, under the Supreme Court's Amtrak decision, which this court has correctly applied in Brooks, said we do not presume absent a clear indication that Congress meant to bind itself in contract, and there's nothing like that here. Anything else? Thank you, Your Honors. Three points. First, to clarify in the appropriations language, the appropriations writers did not cut off all money. Even if they had, we'd still have our argument, but they left $4.4 billion in fiscal year 2014 and 2015 money that was available for five years. That's what we point out in reply brief 24 to 25, plus the appendix 9 footnote 10 points out that user fees collected in 2014 were also available for five years, so the writers didn't even cut off all money. Even if they had, it was not enough under Dickerson and Will. It was just Gibney language. Second, the government says that Congress's intent was clear. As I said, the language is not clear, and it's not sufficient under Dickerson and Will, Gibney, and New York Airways. They face a high standard here, a clear statement rule to show that the appropriation writers not just withdrew money, but substantively abrogated the promise to pay in 1342. If Congress's intent were clear, it would not have kept trying to repeal risk corridor or amend it to make it budget neutral. We point out it put in our reply brief at page 21. Congress, even after 2015 and 2016, kept trying to mandate budget neutrality, so clearly not even Congress itself thought that it had achieved that through the appropriation writers. Of course, HHS kept recording these as obligations. It's true that HHS, as my friend on the other side said, announced that it would implement the risk corridor program in a budget neutral manner over three years, but it kept saying that these were obligations until September 2016. If they want to read HHS, if they want to read the appropriation writers as working a substantive abrogation of 1342, then they're giving force to a Chevron argument in terms of what HHS was saying. HHS was not reading the appropriation writers that way. If their argument is that the appropriation writers worked a substantive change in 1342, they're just giving you more reason to defer to HHS's determinations under Chevron. And finally, the contract point. Congress can change its mind. Judge Moore is completely correct that Congress, whatever that does to the statutory claim, that gives rise to an implied contract or takings claim, just like in Winstar, which is an express contract, but nonetheless, it was a change in mind by Congress that nonetheless created contractual liability for the United States. Actually, I'm really struggling with the contractual liability part. Yes. Recently, new legislation was enacted in the tax area. I bought a house. I got a mortgage. I counted on that mortgage interest being deductible. The government's taking that away from me. Do I now have an implied impact contract with the government that I have 30-year deductibility of my mortgage interest? No, Your Honor. Why not? How is that any different from what you're arguing? Well, because we're not just talking about the statute by itself. The government's argument was 1342 is not a contract. We're not arguing the statute by itself is the contract. It's the implied contract. The implied contract claim arises, as I think I said, from a whole constellation of factors. It is the statute, but it's also the regulations that HHS will pay and the QHPs will receive. It's the course of dealings with the parties. It's the constant promises by our contractual counterparty. CMS kept telling us, yes, you will be paid. All of that would at least make a claim for an implied impact contract. It's different from the Brooks case or the Amtrak case because those cases are just about the statute. Our implied contract claim is not just about the statute. And Brooks is a QTAM statute, which the court went out of its way to say has a long history of not creating vested rights. So I think Brooks is really limited to the QTAM context. And the Radium Mines case, just one last thing. The plaintiff in that case did not have a contract with the government. Yes, the word contract appeared in the statute, but the Radium Mines theory was much broader that there was a promissory structure or framework created. And even though that plaintiff did not have a contract, it was still entitled to money. It did not have an express contract. It had an implied impact contract, just like we have. And so 50,000 people in Illinois lost their health insurance in the middle of the year when the government broke its promise. And this court should enforce the normal rules. If this were a small value case, it would be easy because the law is clearly on our side. And we urge the court to enter judgment against the government. Thank you. We thank both sides. This case is submitted and we now turn to 17-1994 Moda Health Plan. We don't need to play music with chips, so the government can stay. That was for us.